**MERCANTILE BANK, Plaintiff,**

v.

**Michael CANOVAS, Defendant.**

**Bankruptcy No. 97 B 25310.
Adversary No. 97 A 1600.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

June 12, 1998.

Peter Francis Geraci, Chicago, IL, for debtor.

Deborah Ebner, Chicago, IL, for trustee.

### DECISION ON ADVERSARY COMPLAINT FOR JUDGMENT OF NONDISCHARGEABILITY

JOAN H. LEFKOW, Bankruptcy Judge.

This adversary complaint, filed November 21, 1997, is before the court on a prove up of liability and damages after entry of default against defendant, Michael Canovas. The complaint to determine dischargeability of a debt alleges that the defendant, beginning approximately March, 1996, incurred credit card charges on an account issued to him by plaintiff, Mercantile Bank ("Bank"), in the amount of $35,773.74, knowing that he was falsely representing his intention and ability to repay the debt, rather, intending to "resolve" his obligation by filing a petition in bankruptcy. Bank alleges that it relied on Debtor's misrepresentations and as a result has been damaged in the amount due to Bank on the account. Plaintiff asks the court to infer from these facts that the defendant incurred the charges through false pretenses or representations or through actual fraud, within the meaning of 11 U.S.C. § 523(a)(2)(A), and therefore find the debt to plaintiff non-dischargeable.

The district court has jurisdiction over this matter under 28 U.S.C. § 1334. The matter is properly before a bankruptcy judge under 28 U.S.C. § 157(a). This is a "core proceeding" under 28 U.S.C. § 157(b)(2)(I).

### FINDINGS OF FACT

The uncontroverted facts set out in the court record, the affidavit of Stephanie Fircz, Recovery Supervisor for Card Services of Bank, and exhibits appended to the complaint [1] are accepted as true:

On or about December 30, 1994, defendant, Michael Canovas, was issued Mercantile Bank credit card account number 5151206600091291 (the "account"). Defendant represented on his application for credit that his gross monthly income was $3,000. Mercantile issued the card with a credit limit of $5,100. The credit card agreement mailed with the card provided that by using the card, the cardholder accepted the terms and conditions of the agreement, including the assumption of responsibility for all credit extended through the use of the credit card.

Defendant filed a petition in bankruptcy on August 19, 1997. The schedules attached to the petition reflect that defendant had no interest in real property, assets valued at $1,300, and $122,300 in debts, many thousands of which were identified as attributable to credit card purchases. Debtor was unemployed, had no income, and reported living expenses of $1,260 per month.

The first statement of record is dated February 7, 1995, and indicates charges of $95.00 in January 1995. Debtor timely paid the account in full on March 2, 1995. There is no evidence of delinquency on the account through May of 1996. On the June 7, 1996 statement, the balance was $1,354.21 and $40.00 was past due. The balance grew slightly to $1,407.02 on the July 7 statement, no payments having been made in May and June, 1996. Suddenly, during the period July 5 through

---

1. Although the exhibits appended to the complaint are not authenticated, no objection having been made by the defaulting defendant, and there being no indication of inauthenticity, the court considers them as evidence for purposes of this decision.

August 6, 1996, defendant incurred $10,543.08 in new charges. Apart from a rental car charge of $520.66 and a merchandise charge of $152.21, all of the many entries on the August 7, 1996 statement were in amounts less than $100. The merchants reflected were largely service stations, food stores, pharmacies, and restaurants. (Curiously, of approximately 330 transactions, 195 appear to have occurred at oil company service stations, as many as 15 transactions and as much as $422 on a single day, and at least one transaction daily.) The August 7 statement included a notice that the account was seriously delinquent and had been closed.

Despite the notice that the account was closed, during the following month a similar pattern occurred and defendant incurred new charges totaling $15,364.23, a total balance of $27,379.03. $364.00 was noted as past due on the September 7, 1996 statement. Only one charge exceeded $100 in amount. The Bank warned defendant, "Our records show your account is seriously past due. Please ... make payment arrangements. An over limit fee was assessed when your account balance exceeded the established credit limit on 08/08/96." The October 7 statement reflects a balance of $26,740.00 and $889.00 past due. (No purchases were made; payments and credits totaled $1,118.71.) While asking defendant to send payment immediately, warning defendant that "the delinquency on this account may affect [his] ability to obtain credit in the future," Bank in the next breath invited defendant to "get a jump on the holiday" by shopping early with his Mercantile credit card. The November 7 statement reflects $5,240.20 in new purchases, only two entries exceeding $100, a balance of $27,008.80, and $1,237.18 past due. The statement recites for the second time, "Your account is seriously delinquent and has been closed." It also invites defendant to "take advantage" of his credit line. Defendant made two additional charges totaling $52.00 during the next month and no payment. Thereafter, no additional charges were incurred. The account balance, including finance charges, at the time the adversary complaint was filed was $34,710.93.

Bank did not deny defendant's transactions nor notify the merchants involved to deny said transactions. Bank explains that industry standards do not require merchants to report transactions of $100 or less. Charges in the amount of $100 or less that were incurred by the defendant were not submitted to Mercantile Bank for authorization.

There is no evidence regarding when, or over what period of time, any of the other unsecured, nonpriority debt was incurred.

### DISCUSSION

Entry of a judgment of default is discretionary with the trial judge and may be denied where there are insufficient facts to support a cause of action. *Peerless Industries, Inc. v. Herrin Illinois Cafe, Inc.*, 593 F.Supp. 1339 (E.D.Mo. 1984), *aff'd*, 774 F.2d 1172 (8th Cir.1985); *see In re Sziel*, 206 B.R. 490, 493 (Bankr. N.D.Ill.1997)("[E]ven though entry of a default results in admission of the allegations of the complaint, the plaintiff is not automatically entitled to entry of a default judgment.") The policy underlying these decisions is to minimize the "risk that the card issuers may coerce settlements from unrepresented consumers or obtain default judgments, regardless of the merits of the complaint." *Id.* at 492. "Under Fed. R. Bank. P. 7055, courts have broad discretion to 'conduct such hearings ... as it deems necessary and proper' to determine whether a default judgment should be entered." *Id.*, *citing*, *In re Beltran*, 182 B.R. 820, 824 (9th Cir. BAP 1995), *In re Villegas*, 132 B.R. 742, 746 (9th Cir. BAP 1991). In order to accommodate the policy concern, the court will enter judgment only if the evidence submitted establishes a *prima facie* claim for dischargeability.

Bank believes that the facts set out above demonstrate nondischargeability

under § 523(a)(2)(A).[2] "To succeed [in] a proceeding under this section, the plaintiff must prove: (1) the debtor made a representation to the creditor; (2) the debtor's representation was false; (3) the debtor possessed scienter, *i.e.*, an intent to deceive; (4) the creditor relied on the debtor's misrepresentation, resulting in a loss to the creditor; and (5) the creditor's reliance was justifiable." *In re Christensen*, 193 B.R. 863, 865 (N.D.Ill.1996). Exceptions to discharge are to be strictly construed against the creditor, and the burden of proof is on the creditor. *Id.* at 866.

A great deal has been written on what evidence fulfills these elements in the context of credit card debt. *See, e.g., In re Sziel*, 206 B.R. 490, *motion to reconsider denied*, 209 B.R. 712 (Bankr.N.D.Ill. 1997)(Judge Barliant); *In re Murphy*, 190 B.R. 327 (Bankr.N.D.Ill.1995)(Judge Barliant); *In re Alvi*, 191 B.R. 724 (Bankr. N.D.Ill.1996) (Judge Ginsberg); *Christensen*, 193 B.R. 863 (Judge Alesia). The court believes that Judge Barliant's analyses in *Sziel* and *Murphy* are sound. Under these cases, the first element of proof is established if the debtor presented a credit card for the extension of credit. *See Murphy*, 190 B.R. at 332 (Presentation of a credit card for the extension of credit is a representation of intention to pay in the future).[3]

The second element, that the debtor's representation was false, can be established only if at the time the statement was made, the debtor did not intend to honor his statement.[4] *See Id.* ("Under the common law a promise to perform a statement of future intention is actionable as fraud only if, at the time the statement was made, the debtor never intended to honor his statement.") Proof of intent to deceive is measured by the debtor's subjective intention at the time the representation was made, that he knew it to be false or made it with such reckless disregard for the truth as to constitute willful misrepresentation. *Id.* at 333, *citing, In the Matter of Sheridan*, 57 F.3d 627, 635 (7th Cir.1995). A finding of fraudulent intent can never be based solely on inability to pay, although such evidence is relevant to the issue. *Sziel*, 209 B.R. at 714; *Christensen*, 193 B.R. at 866. Other factors that may bear on intent include such things as the debtor's employment and credit history, changes in his financial condition and practices and the reasons for those changes, circumstances surrounding the debtor's use of the credit cards, efforts to improve his condition, and whether facts suggest that the debtor was contemplating bankruptcy when he incurred the charges. *Sziel*, 209 B.R. at 714. *See Alvi*, 191 B.R. at 733 (lists twelve factors). Although these factors bear on the question, the court must look at the totality of the circumstances in order to "determine whether all the evidence leads to the conclusion that it is more probable than not that the debtor had the requisite fraudulent intent." *Murphy*, 190 B.R. at 334.

The court finds that Bank has demonstrated the elements of nondischargeability under § 523(a)(2)(A) with re-

---

2. Section 523(a)(2)(A) provides in relevant part, as follows:

   (A) A discharge under section 727 ... does not discharge an individual debtor from any debt—
   (2) for money, property, services, or an extension ... of credit, to the extent obtained by—
   (A) false pretenses, a false representation, or actual fraud....
   A single test is applied to the claim of nondischargeability under subparagraph (A). *In re Alvi*, 191 B.R. 724, 729 (Bankr.N.D.Ill.1996),

citing, inter alia, *Mayer v. Spanel Internat'l Ltd.*, 51 F.3d 670, 674 (7th Cir.1995).

3. Judge Ginsberg in *Alvi* concluded that the "use of a credit card to incur debt in a typical credit card transaction involves no representation, express or implied." 191 B.R. at 731.

4. The second element of proof requires, literally, a false statement. But a statement of intention to do something in the future requires the fact finder to examine the intent of the representer in order to determine whether it was false.

spect to a portion of the debt at issue. In incurring the credit charges, defendant represented that he intended to pay the charges in the future. Although there is essentially no evidence in the record elucidating the circumstances under which defendant incurred the debt, the court concludes that where the debtor incurred nearly $26,000 in small charges in the course of two months, in a highly unusual pattern (*e.g.*, multiple service station charges on a nearly daily basis), at a time when the debtor's income was modest, and when he likely had enormous debt from many other credit cards and many other obligations, a reasonable jury who heard nothing from the defendant could conclude that the defendant either intentionally or recklessly misrepresented his intention to pay in the future.

▮▮▮▮ The next elements require proof of "justifiable" reliance. *Field v. Mans*, 516 U.S. 59, 74–75, 116 S.Ct. 437, 446, 133 L.Ed.2d 351 (1995). The court in *Field* elaborated at some length regarding the meaning of justifiable reliance. Justifiable reliance is a common law term that entails consideration " 'of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases.' " *Id.* at 70, 116 S.Ct. at 444, *quoting* RESTATEMENT (SECOND) OF TORTS ("RE-STATEMENT"), § 545A cmt. b (1976). "[A] person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.' " *Field*, 516 U.S. at 70, 116 S.Ct. at 444, *quoting* RESTATEMENT § 540. A person is " 're-quired to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation....' " *Field*, 516 U.S. at 71, 116 S.Ct. at 444, *quoting* RESTATEMENT, § 541, cmt a. "[J]ustifiable reliance is the standard applicable to a victim's conduct in cases of

alleged misrepresentation ... '[i]t is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own.' " W. Prosser, LAW OF TORTS § 108, p. 718 (4th ed.1971); *accord*, W. Keeton, D. Dobbs, R. Keeton, & D. Owen, PROSSER AND KEETON ON LAW OF TORTS § 108, p. 752 (5th ed.1984). *Field*, 516 U.S. at 71–72, 116 S.Ct. at 444.

▮▮▮ In this instance, Bank pleads merely that "Defendant has willfully converted the within described property by ... false representations ... for obtaining money or property on credit, whereby Plaintiff relied on Defendant's conduct, implied representations and overt acts...." Complaint, ¶ 8. The only evidence related to reliance is the Fircz affidavit's reference to Bank's not being alerted to the excessive charges based on an industry standard that a merchant is not required to obtain authorization of a credit charge from a bank unless the amount exceeds $100.

The court believes that Bank's reliance was justifiable during the month of July, 1996, when defendant ran up $10,543.08 in mostly small charges (August 7 statement). In other words, Bank had no knowledge or warning that would have made it obvious that the defendant had substantially exceeded his credit limit. Under the instruction of *Field*, Bank in those circumstances justifiably relied on defendant's representations that he would pay. On the other hand, the court takes a contrary view with respect to succeeding charges. Bank, on the August 7 statement, notified defendant that his account was closed. It was, therefore, obvious to Bank that defendant had far exceeded his credit limit. Yet Bank, while terminating defendant's charging privilege, invited him to incur more charges and indeed allowed defendant to continue to charge on the account for another three months. The

court finds that Bank did not justifiably rely on defendant's misrepresentation after August 7, 1996 because it relied on a misrepresentation, the falsity of which was obvious upon cursory examination.

Finally, there is no evidence that the debt incurred prior to July 5, 1996, was obtained by fraud. To the contrary, the account balance was well below the credit limit until the July charges were made. For these reasons, the court finds the debt incurred for the period July 5 to August 7, 1996, in the amount of $10,543.08, nondischargeable. The court finds that the complaint is not supported by the evidence with respect to the remainder of the amount claimed.

### ORDER

For the reasons stated above, the court finds that plaintiff has established the allegations of the complaint to the extent of $10,543.08, plus properly calculated finance charges on that amount until the filing of the adversary complaint. Plaintiff is directed to submit a proposed judgment order reflecting the amount of the judgment according to this decision.